UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
STEPHEN DUNN,                                    :
               Plaintiff,        :                04 Civ. 3035 (MDF)
                    :
         -against-                    :                DECISION
                    :
UNITED STATES OF AMERICA,                        :
              Defendant.           :
-------------------------------------------------------------x

MARK D. FOX,  United States Magistrate Judge.

      This action brought by Plaintiff Stephen Dunn, ("Dunn") seeks recovery, pursuant to the

Federal Tort Claims Act , 28 U.S.C. § 1346(b),  for separate injuries that he suffered in two

accidents, a knee injury on September 7, 2001 and a back injury on June 5, 2002, both at

building 795 on the U.S. Military Academy reservation at West Point.  He attributes the

accidents to the failure of government officials to correct cracks and defects in the floor of

building 795.  The parties consented to the trial of this matter before the undersigned pursuant to

28 U.S.C.§ 636(c).  The following constitutes the Court's findings of fact and conclusions of law

pursuant to Fed.R.Civ.P. 52(a).  All findings have been prmised upon a fair preponderance of the

credible evidence in the trial record, which includes the parties' factual stipulations.

      Under the Federal Tort Claims Act the Governments's liability for negligence is

determined  "in accordance with the law of the place where the act or omission occurred." 28

U.S.C. § 1346(b).  Because the United States Military Academy at West Point is located in New

York State the law of New York concerning workplace premises liability governs the disposition

of this case.

      Plaintiff, a Navy veteran born on March 26, 1958, had been employed since 1999 at the

motor pool at West Point.  When he was injured, Plaintiff  was working as a mechanic for Akima Corporation, the government contractor which operated the West Point motor pool.

On September 7, 2001, while at work in the motor pool,  building 795, Plaintiff  was pushing a steam cleaner out of the rear door of the building.  The steam cleaner, on four (4) rubber tires, was approximately 3 or 4 feet long and 2 feet wide with a handle "sort of like a lawn mower" and oil burner and water hose attachments. Tr. 19.[1]  As he was pushing the steam cleaner and talking with his supervisor, Don Greeno, Plaintiff stepped in a hole in the floor and injured his right knee.  The defect in the floor was triangular in shape, two (2) or three (3) inches long and about one (1) inch deep as depicted at the top of photograph #2 in Ex. 16 and Ex. 14. The photographs evidence that the cracks had been filled in by Plaintiff in March 2002 after he had returned to work.  The photographs accompany testimony which demonstrates Plaintiff's knowledge of the specific location of the crack.  They have not been considered as evidence of a subsequent remedial measure.  Tr.25.

The steam cleaner's size blocked Plaintiff's view of the floor area immediately in front of the machine so that Plaintiff was unable to see the defect in the floor.  Tr. 21, 56-57.   As he stepped in the hole or gap, Plaintiff's knee buckled and he felt severe pain.  Greeno testified that the hole in the floor, which  was 6 to 8 inches long, 3 or 4 inches wide and 1½  to 2 inches deep, had been there for some time. Tr. 89.  Greeno completed an accident report in which he described the hazard as "deep cracks in concrete."   Tr.90; Ex. 3.

In light of the immediate sharp pain, the knee was immobilized, and Plaintiff was sent to

---

[1] "Tr." refers to pages of the transcript of trial, two (2) volumes, singly paginated, conducted on June 5 and June 7, 2006.  A separately paginated volume covers testimony taken on June 12, 2006.  "Ex." refers to trial exhibits admitted into evidence.

an orthopedist, Dr. Harvey Siegel, for a consultation. Despite physical therapy on the knee, the pain continued.  Surgery performed on the knee on February 21, 2002 disabled Plaintiff from work for several weeks.  Tr. 28.  Although his pain continued after the surgery, he was able to return to work and worked until the back injury on June 5, 2002. Tr. 43.

In June 2004 another  surgery performed on the knee did not relieve his pain.  Since the June 2004 operation he has had to wear a large brace on his leg to support the knee.  The brace extends from his mid thigh to mid calf.  He wears it all day, every day, except when he is sleeping. Tr. 44.  In the early 1990s Plaintiff had a previous knee operation from which he states that he made a full recovery with no restrictions or limitations on his use of the knee. Tr. 42.

The second accident occurred on June 5, 2002 in the work bay on the west side of building 795.   Plaintiff was sitting on a wheeled mechanic's stool (Ex. 17) to check the tires of a large truck.  Tr. 32-34   As he sat on the stool and pushed it from one tire to another, the wheels caught in a crack in the floor.  The stool suddenly stopped moving but plaintiff's body kept going so that he was thrown to the floor where he landed on his left hip.  He had been using the stool to check tires in this manner for about a year and a half prior to the accident.  Of the 7 or 8 mechanic's employed at the facility, at least 3 or 4 used similar stools, and none of them had been told by supervisors or West Point Officials  not to use them because of the condition of the floor or for any other reason.  Tr. 34-35, 83, 108-109.

Plaintiff 's Ex. 13, a photograph, depicts the crack in the floor which caught the  wheel of the stool.  A Zippo lighter was placed in the crack to provide a perspective as to the size of the defect.  The lighter, which measures 1½ inches wide  by 2¼ deep and a ½ inch thick, fits loosely in the crack.  Tr. 36-38, 70-71.

After the accident Plaintiff continued to work until June 12, 2002 when the increasing back pain caused him to return to Dr. Siegel for treatment. Tr.38.  He received physical therapy until September 10, 2002 when back surgery was performed by Dr. Steven Jacobs. Tr.39.  In 1988, Plaintiff  had had a previous  back surgery from which he made a complete recovery. Following the 1988 surgery, he was able to work and engage in recreational activities with no difficulty other than occasional aches, which were not so severe as to curtail his activities. Tr .41.

 Plaintiff 's domestic partner, Dorcas Dwidor, who has resided with him since March 2001, testified that he had no physical restrictions prior to the  September 2001 accident. He regularly played racket ball and volleyball, danced, did yard maintenance work, and participated in a bowling league.  After the accident he was unable to participate in any of those activities. Tr.140-143.  The knee surgery performed in February 2002 did not improve Plaintiff's ability to engage in those activities without pain, although he was able to return to work and did so until the June 5, 2002 accident.

Subsequent to the June 2002 accident and concomitant back surgery of September 2002, Plaintiff was unable to work or participate in any of the aforementioned activities. He is also unable to engage in sexual relations. Tr. 145-146.  He wears the knee brace and complains of knee and back pain.  Ms. Dwidor was also aware of a prior back injury in the 1980's which caused numbness in Plaintiff's right big toe, a condition that has continued to the present time. This injury had been the reason for his discharge from the navy.  Tr.147.  Plaintiff  also told her that the only medication which he currently takes for back pain, aspirin, "reduces his pain to a bearable level."  Tr.147-148.

4

<u>LIABILITY</u>

The parties stipulated that the U.S. Government was and is the owner of building 795 at the United States Military Academy and is responsible for its maintenance.  Tr.186.  For the past twenty (20) years Donald Michaud has headed the agency charged with building maintenance and repair on the dates in question,  the Utilities and Facilities Division of the Directorate of Housing and Public Works of the U.S. Military Academy. Tr. 151, 154.

Michaud was familiar with the condition of the floor of Building 795 on or about September 7, 2001, not from personal observation, but from reports and documents on file. It is undisputed that the floor had numerous cracks.  Michaud said that the concrete was considered "dead".  "That floor had been in that building for 50, 60, 70 years."  Tr. 162.  Since 1999 Plaintiff, who undoubtedly spent more time there than any of the other witnesses, had observed numerous cracks all over the place.  Tr. 22.  He estimated the work space area as 50 to 75 feet wide and 150 to 200 feet long.  The cracks were concentrated in the center aisle, which ran from the south door to the north door and in the work bays where maintenance was done on the heavy vehicles.  Facing south to north, the work bays were located on the left side of the area.

At his deposition, Eugene Zarzycki, chief of engineering resource management division of the directorate of housing and public works, explained the system for handling work orders pertinent to obtaining a repair at building 795.  The specific details are not as germane as the seemingly titanic nature of the process that had to be followed to fix a crack in a concrete floor, a process which was apparently subject to complete nullification by the work management people, who had canceled several work orders and requests for repairs to that floor.  Tr. 172.  To Zarzycki's  knowledge, premised on the documents he had reviewed, no repairs had been done to

the floor prior to September 7, 2001.  Tr. 163.  Specifically, Work Order FA00503, generated in April 2000, had sought the repair and replacement of rough floor, a crack on the environmental ramp and the installation of floor drains, all of which was never undertaken.  Tr.179.

Zarzycki confirmed the contents of a document identified as SY55355J, "repair holes in floor."   Although first dated 12/23/94, it was not reviewed by the safety office for a potential tripping hazard until  5/24/00.  Def. Exh. I.  Under safety comments with respect to the potential tripping hazard, it reads:

> Received by safety for review on May 23, 2000.  Rough and uneven surface can contribute to an employee catching the toe or heel of a work boot and stumbling. Potential for injury is somewhat higher when an individual simply trips because maintenance personnel frequently carry parts or tools that they may fall upon even with outstretched hands. The area is walked upon daily by maintenance personnel.

Id.  SY55355J has also been referenced in or merged with Def. Exh. Q, a three page Work Request which contains a log and the scope of the work to be performed:

> Repair deteriorating cement flooring located at the north end of the bldg 795, in line with the over head door.  Remove and replace a 25ft x 75ft section of maintenance shop floor at the north end of the vehicle entrance.  This section of floor has deteriorated severely and cannot be patched.

Tr. 181.  The log indicates that this work request was first considered when received and then sent to plans and programs in September 1996, reevaluated by plans and programs in February 1998 and forwarded to the safety office in May 2000, all confirmed by Zarzycki.  Tr. 274.  In June 2000 the safety office evaluated the condition as RAC 3.  Zarzycki explained that if a repair request involves a safety implication, the safety office should assess and evaluate the level of the problem with an RAC or risk assessment code rating.  Tr. 265.  The RAC ratings go from 1, the most serious to 4, the least serious.  The repairs to the floor of building 795 received a RAC rating of  3, which required the public works officials to "attempt to get there as soon as feasible

6

to do some either temporary or permanent solution."  Tr. 269.[2]  Having been evaluated at RAC 3,

"it was identified as to be programed pending ability to resource it."  Tr. 274.  Resources

apparently were forthcoming only marginally faster than the safety evaluation had been.  Def.

Exh. K, a service order premised on a work request numbered FA03273, indicates a

direction/advisement on November 6, 2001:   "Patch cracks and voids in floor over the north

overhead door area.  Repairs should be made until the complete section of the floor can be

replaced.  Several employees have tripped working in this."[3]  Eventually the 1994 work request

was cancelled in June 2004, apparently because it had been subsumed by other work requests in

the interim.

Zarzycki also explained that the speed with respect to addressing the condition of the

floor had been deliberate:

> A.  The determination was that because it was looked at to be a minor problem and the
> cost to do a full fix was financially pretty extreme as well as causing a high degree of
> upheaval with the operation of the building, because it would have to be shut down for
> quite awhile, that it wasn't feasible to do a complete repair.  So we've been working
> doing minor repairs on that to keep the problem at a minimum or at least from
> accelerating.

Tr. 275.  Although this testimony explains what happened, the record contains nothing from

which the Court may infer that the determination was reasonable, other than that it was made.

The Government has not offered any evidence concerning the time frame for arranging the

---

[2]The risk assessment matrix of the safety office, Def. Ex. H, defines a Severity 3 risk as
"Marginal.  Minor injury.  Lost workday accident.  Compensable injury illness.  Minor system
damage. Minor property damage."  According to Zarzycki, a category three or severity three
problem should be corrected within 30 days or as soon as feasible, tr. 280, which event
obviously did not occur here.

[3]The log on the second page of the exhibit indicates completion of the work in July 2002,
which is after the second incident in which Plaintiff was injured.

repairs, the costs of the repairs nor the specifics about the inconvenience and disruption of the motor pool operation which would have occurred so as to permit an evaluation about the reasonableness of the decision.

The Court is also not persuaded that information contained in the safety inspection reports bolsters or otherwise justifies the decision to delay needed repairs/replacement of the floor. The reports were hardly a model of consistency or clarity. The safety assessment of February 28, 2001 evaluates the safety conditions of the building as "red." Pl. Ex. 11. The report dated March 13, 2002, by a different inspector, gives the building an overall rating of "amber." Pl. Ex. 20. No repairs took place during the interval between the two inspections. Robert Cohen, an employee at West Point for thirty (30) years, the last fifteen (15) as a safety and occupational health specialist, whose job is to inspect facilities characterized the color hazard ratings as "an army thing" and stated that they do not really apply to safety issues. Tr. 304-305. Green is good to go, amber means some issues and red indicates bad shape, all of which do not correspond to the specifics of the risk assessment matrix. They have a purely subjective quality which renders them less than ideal as a reasonable basis for determining the priority of needed repairs. Tr. 304-305.[4]

The evidence persuades the Court that the authorities at West Point knew and were on notice for years prior to these accidents that the relevant area of the floor in building 795 had deteriorated, could not be patched and would foreseeably result in injury to a truck mechanic who worked in that area. The Government asks the Court to conclude that the crack responsible

---

[4]Their subjective quality may also explain why, as Cohen acknowledged in his testimony, tr. 295, they don't contain any references about the condition of the floor.

for the September 2001 injury to Plaintiff's knee was trivial and therefore did not create premises liability.  The New York Court of Appeals has observed that whether a dangerous or defective conditions exists on premises so as to create liability depends n the peculiar facts and circumstances of each case and is generally a question of fact for the jury.  The inquiry requires the court to examine the facts presented, including the width, depth, elevation, irregularity and appearance of the defect along with the time, place and circumstance of the injury.  Trincere v. County of Suffolk, 90 N.Y.2d 976, 977-978, 665 N.Y.S.2d 615, 616 (1997) (mem.).  The parties have cited a number of cases, none of which specifically addresses cracks in a cement floor in a workplace/shop of the type present here as opposed to, for the most part, exterior sidewalks or other areas which may be frequented by pedestrians.  The Government specifically cites the portions of the cases which address width, depth, elevation, irregularity and appearance of the defect.  The time, place and circumstance of the injuries here at issue are not comparable to cracks in a sidewalk.  Employees working in the same area of a shop with heavy machinery and tools during a shift on each business day for years on end are not pedestrians who may pass a sidewalk crack once and then never again.  Cf. Michalski v. Home Depot, Inc., 225 F.3d 113, 117 (2d Cir. 2000) ("Foreseeability of a risk arising from a potential plaintiff's presence on defendant's property is the measure of liability, and it is the essential factor in determining the nature and scope of the duty that the landowner owes plaintiff. (citations omitted).").  In this case, the response to the circumstances may well have trivialized the risk of the injury to an employee working on a concrete floor in that condition, but the condition of that floor posed more than a trivial or insignificant risk of the injuries that Plaintiff suffered.  The "dead" concrete floor of a garage, which had been acknowledged as a safety hazard and where

mechanics worked every day, was 50+ years old, cracked all over so much so that employees were tripping and not subject to patching; nevertheless, no repairs were ever made prior to the occurrences of the two accidents upon which Plaintiff has sued herein. Tr. 181.

With respect to the June 2002 accident the Government relies on the rule that general awareness of a dangerous condition is insufficient to constitute notice of the particular condition that caused Plaintiff's fall. Piacquadio v. Recine Realty Corp., 84 N.Y.2d 967, 969, 622 N.Y.S.2d 493 (1994) (mem.).  The Government observes that no evidence was presented which brought the specific defect in the work bay where Plaintiff testified the accident occurred to the attention of anyone at West Point.  Post Trial Brief, etc. at 7-8 (doc. #17).  Plaintiff relies on constructive notice. Plaintiff's Post Trial Memorandum at 8.  "'To constitute constructive notice, a defect must (1) be visible and apparent, and (2) must exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it.' (citation omitted." Robin v. Wal-Mart Stores, Inc., 37 F. Supp.2d 605, 607 (W.D.N.Y. 1999), aff'd, 242 F.3d 367 (2d Cir. 2000).  The condition at issue was visible and apparent for years and should have been remedied by West Point's agents.  It was not, apparently because Zarzycki, in consultation with others, elected to put cost, which they presumably knew, ahead of the safety risk, about which they had been warned and about which they should have known.  Moreover, the Court is persuaded that all of the observations and findings over the years concerning the floor in building 795 placed the Government on notice that the entire floor in that building was "dead," defective and deteriorating, as evidenced by extensive cracks, and in need of replacement.  See Ex. P; Tr. 162, 180.

In this case a finding of liability by Defendant necessitates consideration of comparative

fault.  The Court recognizes that the defect or hazard was obscured by the machine as Plaintiff

pushed it forward in an appropriate manner.  The obscurity does not alter the circumstance that

Plaintiff was also acutely aware of the condition of the floor, as evidenced by his own testimony.

Tr.55- 56, 65-66, 68-69.  He had also moved this machine previously through this area without

incident.  Accordingly, if Plaintiff had been concentrating fully on moving the machine, as

opposed to having been marginally distracted by conversation with his supervisor, he might have

been paying more attention and perhaps would have been more likely to see the crack and avoid

it.  From this inference, the Court has concluded that Plaintiff bears ten percent (10%) of the fault

for the accident of September 2001.  See Michalski, supra, 225 F.3d at 121 ("The open and

obvious nature of the condition does not necessarily negate defendant's duty, but as some

departments of the Appellate Division have recognized, the nature of such conditions would be a

factor appropriately considered in the apportioning of comparative negligence when awarding

damages. (citations omitted)."). By contrast, with respect to the June 5, 2002 accident and

resulting back injury, Plaintiff had used that wheeled stool many times previously in that same

limited work bay area.  He was close to the ground as he sat on the stool and was in a position to

observe the cracks and defects in the floor including the one which caught the stool wheel and

caused his injury.  Given his awareness of the condition of the floor in that area, he moved the

stool too quickly under the circumstances and as a result is seventy percent (70%) at fault.

### MEDICAL EVIDENCE/PRE-EXISTING CONDITION(S)

Plaintiff has had three surgeries on his knee, one in 1990, one in February 2002 after the

first accident and one in May 2004 after the second accident. According to Greeno, when he first

met Plaintiff, which occurred after the first knee surgery and before the first accident, Plaintiff

11

walked with a limp in which he favored his left side.  Tr. 101.  Dr. Frazier examined Plaintiff for

the Government on June 20, 2005, tr. 6/12/06 at 12, which is after treatment for both accidents.

Curiously, he  reported that Plaintiff showed no evidence of an antalgic gate, which describes a

limp that results from a weakness to one side, nor any limp.  Id. at 34.  The condition of a knee

which now requires a brace after a second surgery, tr. 43-45, will not improve with time.  The

necessity for the brace supports the inference that a limp no longer alleviates whatever pain or

discomfort that Plaintiff previously experienced and therefore that the accident of September 7,

2001has exacerbated the condition of his knee.

        The medical evidence concerning the current condition of Plaintiff's knee and the source

of that condition, degenerative changes as opposed to the accident, was, as might have been

anticipated, also in conflict as between the experts.  The Government offered evidence from Dr.

David Weiss, an orthopedic surgeon, that the September 2001 accident resulted in a torn medial

meniscus of his right knee.  Plaintiff showed evidence of a preexisting injury to that knee and a

prior surgery to the meniscus from ten (10) years previously.  Plaintiff also exhibited evidence of

chondrocalcinosis, a build up of calcium pyrophosphate crystals which come out of solution into

the tissues, including the meniscus.  The crystal deposits irritate the meniscus and make it more

likely to tear.  Tr.194-195.  Dr. Weiss noted these findings, reviewed the post operative reports

from both of the surgeries on Plaintiff's knee and concluded that Plaintiff's knee showed evidence

of degenerative changes which would have pre-existed the injury of September 7, 2001.  He

opined that those changes weakened the knee and made it more susceptible to injury.  Tr.201,

214.  He  attributed one quarter (25%) of the present damaged condition of Plaintiff's knee to the

accident and three quarters (75%) to prior degenerative changes.  Tr. 207.

In contrast to Dr. Weiss, Dr. Joel Mandel, an orthopedist with forty-five (45) years practice, twenty-five (25) of them as a surgeon, concluded that preexisting degeneration accounts for only twenty-five (25%) of the condition of Plaintiff's knee and the accident accounts for seventy-five percent (75%):

> A.  ....  When the first surgery was done after the accident, the knee itself looked very good.  There was no piece of cartilage missing.  And the only findings were acute findings.  There was a complex tear of the medial meniscus and that was addressed.  There was nothing in that operative report which indicated that [he] had any chronic condition.

Tr. 318.  Dr. Mandel's understanding of the absence of chronic findings in the report of the surgery, which is consistent with Plaintiff's level of activity prior to the injury in September 2001, have persuaded me that the current condition of Plaintiff's knee is, as Dr. Mandel has testified, seventy-five percent (75%) attributable to the accident.

Dr. Weiss measured the circumference of plaintiff's injured right leg at several points and compared the measurements with his healthy left leg and found no evidence of atrophy.  He noted that plaintiff's examining physician, Dr. Joel Mandel, disagreed, having found 1.8 centimeters or three quarters of an inch (¾") of atrophy in the right thigh. Tr. 313.  Dr. Weiss estimates that Plaintiff has a two percent (2%)  impairment of the use of his right leg as a result of the injury and that the disability is permanent.  Tr. 196, 213, 216.  He also stated that if Dr. Mandel 's measurements are correct the degree of impairment increases to eight percent (8 %).  Tr.209-210.

Dr. Mandel found that Plaintiff had a prior injury and surgery to that knee in 1990, but had made a full recovery. While that surgical procedure involved the removal of some of the meniscus, only a very small piece was removed.  Tr. 316.  Plaintiff worked full time as a heavy truck mechanic for ten (10) years after the 1990 surgery, during which time he experienced no problems with that knee.  Tr.312.  The two surgical procedures which were required to treat the

injuries resulting from the September 7, 2001 accident amounted to what is functionally a total

meniscectomy, or total removal of the meniscus which would leave Plaintiff with a disability of at

least seven percent (7%). Tr.320.

After the second knee surgery, but before the third knee surgery, Plaintiff returned to work

at the West Point motor pool until he suffered an injury to his back during the June 5, 2002

incident.  Plaintiff gave a history of  experiencing low back pain immediately after the incident.

He was treated conservatively with oral medication and physical therapy without success. The

pain increased in severity and he was unable to work.  An MRI revealed  herniated discs at two

levels in his back.   In the moderately sized herniation at L5-S1an extruded fragment of the disc

had migrated down to the area of the S-1 nerve root.  Tr. 322, 324.  Dr. Mandel described the disc

as not only herniated but also shattered because part of it had been broken into pieces.  Dr. Siegel

referred Plaintiff to Dr Steven Jacobs, a neurosurgeon who excised the herniated disc at the L5-S1

level on September 10, 2002.  Tr. 322.

According to Dr. Mandel, this herniation was causally related to the June 5, 2002 incident

and was not preexisting, as evidenced by Plaintiff's full time employment as a heavy truck

mechanic for a number of  years prior to the accident.  A heavy truck mechanic bends over

engines, pushes, pulls and lifts parts and engages in other heavy labor.  Tr.323-324.  Plaintiff

could not have performed the duties of a heavy truck mechanic had such an injury been present

before the June 4, 2002 injury.  Tr. 324.

Plaintiff did have a preexisting back problem for  which he had surgery in 1988.  That

procedure was a partial discectomy at the L4-5 level.  The whole disc had not been removed as

Dr. Mandel found a herniation of the disc at that level in an MRI conducted after the June 2002

14

incident.  If the disc at that level had been entirely removed in 1988 , it could not evidence herniation in 2002.  Tr.326.

Dr. Mandel also opined that Plaintiff is unable to return to doing the heavy mechanical work which he had done previously.  He noted that other physicians who have treated Plaintiff, Drs. Seigel and Jacobs, had also recommended that he not return to his prior work.

> A. [Dr. Mandel] He couldn't work very long.  He would have extreme pain.  Not only that, as I described very clearly, the findings indicate now that he has had the L5-S1 disk excised....the L4-5 disk is <u>now</u> showing its ugly head.  And his findings clearly indicate neurologically and by pin prick, by muscle strength, by numbness and all of his other findings that he has an acute disk at the L4-5 level <u>now</u>.  So I certainly would never think for a second that he could ever return back to work and I would certainly advise him to not even think about that.

Tr. 327 (emphasis added).  Objective evidence of a condition present now obviously permits the inference that the condition was not present previously.

Through its expert evidence the Government sought to attribute the current condition of Plaintiff's back more to prior circumstances and less to the injury suffered in the June 2002 incident.  The Government cites the numbness that Plaintiff experienced in his big toe following the L4-5 surgery in 1988.  Dr. Mandel explained, however, that a patient may experience residual numbness in the L5 dermatome, which includes the big toe, even if everything is fine and activities are normal.  Tr.333.  The Government's expert also posits that physical therapy would have a ninety percent (90%) percent chance of being effective in addressing the degenerative changes that the expert finds are responsible for the current condition of Plaintiff's back.  Tr. 6/12/06 at 39-40.  Even if I credit this opinion, nothing in the record indicates that Plaintiff's injury falls within the category of back injuries, as opposed to degenerative changes, which respond effectively to physical therapy, nor was any evidence offered as to the diagnostic factors

or symptoms of any particular type of back injury which would respond to such treatment.[5] The circumstances, specifically Plaintiff's work history, persuade me that all of Plaintiff's present back symptoms stem from the injury on June 5, 2002.  Tr. 328-329.

In light of the finding of degenerative changes and Plaintiff's smoking the Government's expert observed that smokers have a five (5) times higher incidence of chronic low back pain and disc degeneration than nonsmokers.  Tr. 6/12/06 at 13.  Degenerative changes may appear even without symptoms of back pain or the back pain may appear later.  Id. at 16.  The patient must also be susceptible to the effects of ingesting the cigarette smoke.  Tr.334.  Whatever other risks a smoker may run, the instant record contains no evidence that Plaintiff's smoking and the condition of his back are related.

The Government's expert also opined that the condition of Plaintiff's back immediately prior to the June 2002 injury predisposed him to injury and that the accident of June 2002 aggravated or precipitated a previously quiescent condition and therefore that accident had precipitated his inability to work.  Tr. 6/12/06 at 42, 43, 49-50.  While Plaintiff  had a ten percent (10%) disability when he was discharged from the U.S. Navy and had experienced intermittent back pain over the years since his 1988 surgery, id. at 22- 22, which may evidence a preexisting weakness and possibly some degenerative changes, the Court will not ignore the uncontroverted circumstance that the condition of his back, whatever it may have been, did not prevent him from satisfactorily performing his duties as a heavy truck mechanic during the years he was employed at the West Point Motor Pool prior to the June 5, 2002 incident.  Accordingly, the injury suffered

---

[5]This finding dispatches the Government's argument that Plaintiff has failed to mitigate his damages.  Post-Trial Brief, etc. at 11-12 (doc. #17).

in that accident was the precipitating cause of the disability which prevents him from returning to that employment.

<u>DAMAGES</u>

The damage awards are reported in accordance with N.Y. Civ. Prac. L. & R. §4111(f). <u>See</u>, <u>e.g.</u>, <u>Urbano v. United States</u>, 93 CV 4588 (JLC) (E.D.N.Y. Feb. 7, 1996) (1996 Westlaw 68562at *7); <u>Ferrarelli v. United States</u>, No. CV 90-4478 (JMA) (E.D.N.Y. Sept. 24, 1992) (1992 Westlaw 893461 at *19). The Court turns first to economic loss, which includes out of pocket medical expenses, lost earnings and impairment of earning ability. <u>See</u> <u>Taylor v. Henderson</u>, 175 A.D.2d 590, 573 N.Y.S.2d 793 (4th Dep't 1991) (<u>mem</u>.).

The parties stipulated that Plaintiff's medical expenses incurred as of the date of trial relative to the September 7, 2001 accident are $17,738.05 and that his medical expenses incurred as of the date of trial as a result of the June 5, 2002 accident are $9,347.13. Tr. 186-187. The judgment must be reduced by Plaintiff's proportionate share of fault for each incident, by ten percent (10%) and seventy percent (70%) to $15,964.25 and $2,804.14 respectively.

Each side presented a report from an economist as to the extent of Plaintiff's financial losses from his injuries. The differences between Plaintiff's expert, Dr. David Kennett and the government's expert, Dr. Leonard Freifelder, stem both from the methodology used and the assumptions made. Tr. 117.

Freifelder adjusted his calculations for taxes and reduced his number to present value for a total of $320,668.00. Tr. 118-119. Recalculating for taxes and reduction to present value, which according to Freifelder had not been done by Kennett, tr. 250, Kennett, relying on his factual assumptions, testified that "the single sum in 2006 which would reflect the stream of losses

17

incurred over 20 years or so of his work life" was $474,760.00. Tr. 119. The difference stems from different assumptions: work life expectancy 62.9 years (Kennett, tr. 124) vs. 60 years (Friefelder, tr. 230-231); growth rate of 3.8% (Kennett, tr. 120, 129-133) (assuming wages will keep pace with the consumer price index) vs. 3% (Freifelder, tr. 253-254)[6] ; they used different tax rates from different tables; Friefelder added 9% for future benefits from Plaintiff's secondary occupation vs. Kennett opined that this addition was speculative because Plaintiff was not receiving any benefits from his secondary occupation, tr. 118-122; Freifelder had reduced his number 7.2% for work expenses, and Kennett had not, tr. 244; Freifelder disagreed with Kennett's methodology for adjusting Plaintiff's social security benefits, tr. 251-252; they disagreed concerning fringe benefits in post accident employment, tr. 252-253, 256.

After observing and listening to the two experts and considering their backgrounds and educations, in light of the credible evidence presented, including their testimony and the lay testimony, the Court has arrived at the following awards of damages. All damage awards have been adjusted at the outset to reflect the extent to which the Court has concluded that Plaintiff's preexisting conditions have contributed to or are the cause of his present damaged condition: no reduction for past economic loss for the period from September 7, 2001 to June 5, 2002 attributable to Plaintiff's prior back injury because Plaintiff was fully employed until the accident of June 5, 2002; 25% reduction on awards for non-economic loss for September 7, 2001 accident attributable to prior knee injury; 10% reduction on all awards for June 5, 2002 accident attributable to prior back injury.

---

[6]The Akima contract for the two years immediately subsequent to the injury provided for fifty cent ($. 50 ) per hour wage increases. This increase, premised on Plaintiff's 2002 hourly wage of $20.36, tr. 245, is not consistent with either economist's forecast.

From the date of September 7, 2001 accident and resulting knee injury to the date of the verdict:   Lost wages/impairment of earning ability - none; pain and suffering, including the loss of enjoyment of life - $40,000 reduced by 10% for the judgment to $36,000.

From the date of June 5, 2002 accident and resulting back injury to the date of the verdict: Lost wages/impairment of earning ability - $70,000 reduced by 70% for the judgment to $21,000; pain and suffering, including the loss of enjoyment of life - $60,000 reduced by 70% for the judgment to $18,000.

With respect to the accident of September 7, 2001 and resulting knee injury, damages to be incurred in the future: Lost wages/impairment of earning ability - none; pain and suffering including the loss of enjoyment of life - $170,000 reduced by 10% for the judgment to $153,000.

With respect to the accident of June 5, 2002 and resulting back injury, damages to be incurred in the future: lost wages/impairment of earning ability - $380,000.00 reduced by 70% for the judgment to $114,000; pain and suffering including the loss of enjoyment of life $270,000 reduced by 70% for the judgment to $81,000.

Based upon the evidence of Plaintiff's present physical condition, his habits and his general health and level of activity and after reference to the appropriate tables of the Bureau of Labor Statistics, the Court finds that Plaintiff's work life expectancy is to age sixty (60) and that Plaintiff's life expectancy is 22 years.

Within ten (10) days of this decision, the parties are directed to submit a proposed form of judgment, which reflects the Court's findings and damage awards, consistent with the provisions of N.Y. Civ. Prac. L. & R. §5041.

SO ORDERED.

Within ten (10) days of this decision, the parties are directed to submit a proposed form of judgment, which reflects the Court's findings and damage awards, consistent with the provisions of N.Y. Civ. Prac. L. & R. §5041.

SO ORDERED.

Dated:   April **10**, 2007
White Plains,  New York


_____
                    Mark D. Fox
                    U.S. Magistrate Judge

In light of the time frame of the direction contained herein, copies of this decision have been sent by mail to the following:

Andrew J. Genna, Esquire
Attorney for the Plaintiff
Finkelstein & Partners, Counselors at Law
436 Robinson Avenue
Newburgh, New York 12550

Benjamin H. Torrance, Esquire
John P. Cronan, Esquire
Assistant United States Attorneys
86 Chambers Street 3rd Floor
New York, New York 10007